Ms. Mineta, whenever you're ready. Good morning, Your Honors. I'm Lana Mineta, and I represent the appellant, Humane Farm Animal Care, Incorporated, and we are here on an interlocutory appeal from the District Court of the grant of a preliminary injunction that both mandated speech and enjoined speech, in that the court mandated that our client send out a clarifying e-mail. Well, surely, if the Lanham Act does anything, it circumscribes certain speech. It does. So, I mean, the fact that it's speech certainly imbues this with a constitutional dimension, but the Lanham Act pretty clearly is what's in play here. Oh, yes. No. Undoubtedly, yes. And our position is that the court erred in finding that the Lanham Act should cover the e-mail in question in this case, the May 20th e-mail sent out by our client. And our position is that it doesn't fall under the Lanham Act in that it is not, quote, commercial advertising or promotion. And that obviously is the crux of our appeal. It certainly wasn't substantiated either, was it? I'm sorry? The whistleblower claim that didn't come from a whistleblower? Well, Your Honor, you know, the district court utilizes the whistleblower definition that is used in Federal court. But the definition of whistleblower is a person lodging a complaint. And I think that in our reply brief ‑‑ Was there a complaint lodged? Yes. Yes. An individual who had worked for ‑‑ I thought she was just examining. She was in a warehouse that jointly housed both parties' eggs and saw what she misunderstood as being noncompliant eggs. No. No, Your Honor. In fact, there had been a phone call made, and this is referenced in our reply brief, as well as in pleadings that were filed within the district court. There had been a phone call that was made to our client by an individual who worked for Vital Farms, who is ‑‑ Vital Farms is another egg company. This person worked for Vital Farms and had called and complained that he knew people who worked at Phil's who packed eggs for Hansenbrook and knew that the eggs were not being pastured or raised. And so when we look at Merriam-Webster, the sort of layperson definition in the dictionary of whistleblower, it is one who reveals something covert or informs against another. So the layperson definition of a whistleblower fits. As attorneys, especially within the federal system, we have a different definition of whistleblower. But for someone who is outside of that system, the use of the word whistleblower fits squarely in that type of situation. And in fact, you know, someone with internal knowledge within the industry, it fits even more squarely. But those contentions are contradicted, are they not? I'm sorry? The statement about the whistleblower complaint is contradicted in an affidavit. And also, my point actually was that the report's statement regarding the basis underlying the recertification was false. Yes. The statement regarding the reason for the inspection. And as I recall, the certifications were in fact current, and that was the representation, let's see, the umbrella certification of Hansenbrook, okay, which covers. I think it went on to say that Hansenbrook's cartons could not be verified and that the certifications were not current. Right. And that wasn't true. Well, it depends how you want to look at this. I thought their certifications were current and that it could have been determined had it been pursued. Well, this is an issue that we raise in our reply brief. The auditor and our client are distinguished in the plaintiff's complaint. Either they were current or they weren't. They were current, but they were not present. The certifications were not current can't be correct. Well, they were not present and available at the time of the audit. And, of course, the person who sent the email was not the person who did the audit. So Adele Douglas, who is the founder and the president of Humane Farm Animal Care, who is our client. But you said you conducted a traceability inspection. No. When our client conducts an audit, when our client certifies a farm, they do a traceability inspection. These are farms that are certified by the American Humane Association. Hansenbrook is certified by the American Humane Association. They do not do traceability audits. So, in other words, their certification is an umbrella. Hansenbrook is certified. Therefore, all their source farms are certified. Based upon a whistleblower complaint, we recently conducted a traceability inspection. Right. Okay. could not confirm the pasteurized nature of the eggs because the source farms are not independently inspected. In other words, the certification is only for Hansenbrook. And that actually, it's an umbrella certification. Okay. But I think we're sort of getting far. We're getting into the falsity, whether or not the statements are true, false, and that is undoubtedly a factor of likelihood of success on the merits. But we have not addressed whether this is commercial advertising or promotion. We also have not really talked about the fact that there is – Well, let me ask you about that. So the second part of this e-mail, your client says, I hope you'll consider changing suppliers, producers who are certified humane, your client certificate, undergo traceability audits to verify that every egg, et cetera, et cetera. Right. That sounds to me like a solicitation to accept your client's audit process. Well – At least it could certainly be reasonably read that way, and that's the way the judge read it. Yes. I mean, but Bolger, of course, lists that there – you need to look for more than simply one factor to determine that something – certified humane undergo traceability audits to verify that every egg that goes in every carton that has claims such as free-range or pasture-raised are verified by our inspectors to be exactly that. This, in turn, protects you. Right. And what is – How would the reasonable person infer from that, that they're not being asked to change suppliers? Well, not necessarily. When they're being asked to consider changing suppliers? Not necessarily, because, again, what is missing from this e-mail, this e-mail does not say change from American humane to certified humane. I hope you will reconsider changing suppliers. Well, yes, I understand, Your Honor. But the problem that is being alerted to the recipient of these e-mails is not that Hansenbrook Farms eggs are not certified by the right company or by the right certifier. It's that they are not humane at all. So there's an issue – Well, that's all that it would have said. Well, there's an issue there. Let me finish. I'm sorry. That's all that your client had said. We might have a different case, but that's not all that it says. I understand. And allow me to try to articulate this a little bit better. Remember, the mission of humane farm animal care is the ethical treatment of animals. So if there were, if the belief upon reading the auditor's report was that the certifications were all in place and everything was as it should be, then this would not have occurred. And this e-mail would never have been sent, right? And then so the issue from my client's perspective was the animals are not being treated well, so we urge you to change suppliers, not because – I'm sorry, Your Honor. No, go ahead. Finish. Not because American humane certifications are bad, but because no certification is bad. So we urge you to change suppliers because ethical treatment of animals is good, and we assure you that if you see certified humane, you have ethical treatment of animals. Why isn't that a solicitation to find certification? Although there is some commercial aspect to that, it is not a purely commercial motivation. Does it have to be purely commercial? It doesn't have to be purely, but if there is a broader, larger objective, we think that there is more of an aspect of political speech involved here. I mean, this organization is more along the lines of a consumer reports kind of organization. But it generates a large part of its revenue from the certification process. Well, I mean, you know, but that revenue, when it earns revenue, that revenue when it comes back into the company, it doesn't go into advertising or packaging or store displays the way that Hansenbrook's, you know, revenue does. Why does that matter? It's a revenue enterprise. And the problem, this email, I am writing you to share some potentially troubling news about one of your egg supplies. So immediately it's an alert. And it goes on to say that pasture raised claims could not be verified, when in fact, as I understand it, no attempt was made at verification. And then it closes by saying, I hope you will reconsider changing suppliers. And what I think is interesting is that between the complaint and the filing of the brief in this court, the plaintiff, the district, Hansenbrook, has shifted their position from who should have done. Can we sort of stay with my question? Well, I'm sorry. Could you repeat your question, Your Honor? I'm sorry. You seem to be saying that this is focused on highlighting the public good issue of the humane and ethical treatment of animals. Of these. Chickens. And I guess I'm not quite sure, first of all, I don't see anything to suggest that that's what you are saying. You're saying of the three producers whose eggs were being packed into HBF cartons, none were pasture raised. Well, the, and that the organic certification was not current, which was not true, and then goes on to say, I hope you will consider changing suppliers. I mean, I guess Red as a whole, it's hard for me to see that as a fairly savvy consumer. Well, again, these are, pasture raised has within the industry its definition. Which has to do with how much space the chickens have to move around in and how much time they're out of the cages and things like that. And so these are retailers that are receiving this email. And I mean, it's important to note that Ms. Douglas does not name particular brands of eggs in this email. She does not say, so you should buy brand A, brand B, you know, these are the brands that we suggest that you buy. And some of these retailers are already buying eggs that are certified humane. Some brands can be certified by American humane and certified humane. There's not, there's no rule that says you can only be certified by our client or American humane. And that, I think, is a very key point. That, you know, although Hansenbrook says, you know, they're in competition with each other, a brand can choose to be certified by both, you know, by both of them. But, you know, I think. But you want them to change. Change from the brand that she sees at the time as not being pasture raised. And the last point I wanted to make about the issue of being able to verify, Hansenbrook in the complaint seems to be saying, or it does say explicitly, repeatedly, she, she, she, she, she, meaning Adele Douglas should have made a phone call and made these verifications. In the brief filed in this court, the auditor is who they claim should have made the phone call to. But you referenced Hansenbrook. You're saying that in your, in your email, you specifically refer to Hansenbrook Cartons. There was no ambiguity about that. Yes. So your email did target Hansenbrook Cartons as one of the participants in this potentially troubling news. Yes. Thank you. Chief Judge Gregory, may it please the Court. My name is Sanjay Karnick, and I'm appearing on behalf of the appellee plaintiff, Hansenbrook Farm. The district court properly preserved the status quo of the parties before the email was sent and issued minimal, narrowly tailored mandatory relief to reduce the immediate harm befalling Hansenbrook as a result of the email. Your Honor, there are three main points that I want to make this morning, primarily in response to HVAC's reply brief and the arguments this morning. The first argument concerns HVAC's argument that the, that Hansenbrook Farm is now attempting to place blame upon the inspection report. I want to make clear, Your Honor, that we're bringing this action as a result of the statements in the email, not in the inspection report. The email makes several statements that go beyond what the inspection report states that make the email itself actionable under the Lanham Act. And to the extent that the, that HVAC is relying upon, you know, claims to be simply parroting what the inspection report says, I'll note that the inspection report itself at JA 276 warns that, quote, all findings presented herein are intended to be subject to review by HVAC staff. HVAC performed no such review. That report also says this report does not constitute certification or consultation, nor should it be used for promotional purposes. HVAC does use that inspection report for promotional purposes. HVAC ignored both of these caveats in the inspection report and used it to, as an initial minimal support to promote humane certified eggs and denigrate falsely Hansenbrook Farms eggs. The inspection report does not contain the words, in fact, none of the eggs were pasture raised. HVAC added that false statement to the email. My second point here is that the commercial nature of the email is evident by the chosen recipients and by HVAC's own statements. Judge D, as you just, you alluded to, and Judge Duncan as well, alluded to taking it in the viewpoint of the listener. Let's establish, let's understand what the district court determined who the listener was. They were commercial buyers from the top 10 grocery store chains in the United States, over 16,000 stores. Reading the first statement, one of the first statements in the email, based upon a whistleblower complaint at JA 504, the district court determined that the audit was, quote, not because of any complaint. The district court determined the whistleblower complaint statement to be false. The district court also determined the statement, and I'll read the exact statement in full. In fact, of the three producers whose eggs were being packed into HBF cartons, none were pasture raised. The district court determined that statement to be false and HVAC has not demonstrated any argument or pointed to anything else in the record to show that that determination was in clear error. Because it's false, does that mean that it's commercial? I think, Your Honor, it doesn't. It could be false and still not commercial, can it, in those sense, in terms of organizations like theirs that promote humane treatment of animals or other type organizations? Falsity doesn't make it commercial, does it? Just a question. In a vacuum, no, Your Honor. In this situation, yes, because that final paragraph that HVAC had stated, I hope you will reconsider changing suppliers. Our position is that paragraph certainly falls within the, quote, core notion of commercial speech, and the false statements in the e-mail leading up to that core notion statement present the entirety of the e-mail within the realm of commercial speech. But you're saying that they have said that, something to the effect of paraphrasing, I hate to inform you of this, I have to inform you of this bad news, that it looks like a serious question whether or not these have been actually pasture-raised chickens and the eggs they're produced there from. There's no guarantee there. And that's what I'm telling you, period. And those were termed to be false, as to no evidence, as we now know that they're not correct. That would make it commercial? That's... All the false things they said in terms of whether or not it is traceable and whether or not there was any indication that they were pasture-raised, all those things, and period, didn't say anything about you need to change, you need to look at our company, and that's it, period. Would that be commercial? I think, Your Honor, that would be commercial given the record and the evidence established in the record. But you say that falsity alone is enough to make it commercial. Your Honor, what I'm saying is that these statements themselves, I think the e-mail, the entirety of the e-mail is of a commercial nature. The Chief is positing a different question. The second paragraph is out. It's simply an indication that there's a problem, there's something amiss here with no solicitation and nothing else attached to it. Is that enough to make it a commercial speech? It may not be, Your Honor, but that's not what was before the District Court. I think that's why he said, I think that's why he presented it as hypothetical, because it's not what's presented here. Or is it because it was delivered to these commercial, these supermarket entities that makes it commercial? I do think, Your Honor, it is. You have to have both? Is that what you're saying? I think it's a pretty straightforward question. Is falsity alone enough? I think if you combine the falsity of the statement. No, Your Honor. If the rest of the e-mail and the viewpoint of the listener were to be disregarded. And if the false statements were given to these large grocery chains, that wouldn't be enough either, would it? No solicitation in the second paragraph, just falsity and distribution to those grocery chains. Your Honor, that would be actionable, Your Honor, because the viewpoint of the listener, the Fourth Circuit has determined that the viewpoint of the listener is an important aspect in addition to the three-part test. But that would stifle the whole purpose. The purpose for humane societies and others likewise is to gather data. If they can't give that data to someone, then you effectively say they're out of business. It's just like consumer reports. That's like saying you can put the report together, but you can't send it out. Your Honor, we're not in any way seeking to limit their ability to comment about... I'm just trying to get the term with the narrowness of what you're claiming. So would you concede that it's not just a falsity, and it's not just a falsity plus distribution to grocery chains, correct? I don't concede the second point, Your Honor. I think the fact that HVAC targeted the email to these major grocers and stated false statements, that is... You're adding the false statements. That's number three. One, two, three. Falsity, distribution, now promoting. Leave the promoting part off. It's just saying terrible news, the news is false, some of it, and I'm giving it to the grocery chains. But I don't do any solicitation saying, you know, you really need to change. We're better, we can do it better, and you need to change. That's all gone. That would not be a Lanham Act violation, would it? Yes, Your Honor, it would. It would be because of what? Because the way that 1125A1B is stated, it references false advertising or promotion in the misrepresentation. And so stating those false statements itself is a misrepresentation. Is it advertising? Is it promotion? It's a false advertising, Your Honor. Something can't be advertised. In the framework of Judge Gregory's question, it seems to me that there are three components, I think, at least as I see it. There's the expression itself, and it's false. We're assuming that. Then there's the, I guess I would call it targeting of the recipients of the message. And three, there's the solicitation. And I kind of think I've heard you say, I hope I've heard you say, that you can't draw the line after falsity. I think, are we not in agreement on that? I'm trying to understand the hypothetical. Mine isn't a hypothetical. I'm just asking where in your argument, think about it, where in your argument do you draw the line on what is actionable? Is it at the falsity step? Is it at the falsity plus what I call targeting step? Is it the falsity plus targeting plus solicitation step? I think, Your Honor, it would be the falsity and the targeting of these recipients is the step where it's actionable. And again, this is not the situation. We do understand that. I think we were just trying to draw a line, I think. And I'll raise a hypothetical of my own. Do you want us to answer it? No, Your Honor, I'm just giving an example of what HVAC's argument would be. If they were to publish a false statement that was in a trade magazine or a consumer report, that would not be actionable. A further investigation may need to be done to determine whether that alone would be actionable. In this situation, we have a targeted e-mail sending of false statements, and HVAC has pointed to no evidence in the record that contradicts the district judge's conclusion that these were false statements sent to commercial buyers with that important final paragraph. Continuing to take into account the viewpoint of the listener, there's an additional literally false statement determined by the district court that the organic certification was not current. And as I'd stated, the final paragraph is the twist that presents in this situation the entirety of the e-mail within commercial speech. And how does the final paragraph – well, it doesn't have to tip it over because you already said the line is drawn, but let's assume – what does it add to you? I think what the final paragraph does, Your Honor, is take what could possibly be a 50-50 message, although the falsity of the statements – let me rephrase that. I think what the final paragraph does, Your Honor, is tie in the falsity of the statements and make a commercial pitch for HVAC services, which renders the entire e-mail within – it may still be a mixed message as the district court determined, but the fact that it's a mixed message doesn't mean that it's not commercial speech. Did they say that you should hire us? That is the conclusion of the e-mail. No, did it ask to be hired? The e-mail asks – the e-mail states that – and the district court determined that it does make a promotional – No, I don't want to – we're here for the appellate court. I don't want to hear – we know the district court. I'm saying your argument, does that make a difference in terms of the finding? The fact that they – did they ask for – to be hired? Yes or no? Yes, they did, Your Honor. And how – what's the statement that says, hire us? Based on the – Yes, Your Honor, and it falls within the commercial advertising promotion. Whether this court wants to adopt that Gordon breach or not, even under the court's other precedent of defining commercial speech, we believe it meets within that. And my final point, Your Honor, and we may have touched on this before, but the injunctive relief was narrowly tailored. In fact, Your Honor, the Hansenbrook Farm had asked for a website correction, and the district court determined that that was a step too far and issued a mandatory relief in a corrective e-mail and then a prohibitory relief in preventing further dissemination. One other point in the – Of that e-mail. And the order correctly – I'm sorry, Your Honor. Let me – I want to be sure that the district – that Your Honors understand the narrow nature of the mandatory relief. The district court prevented any substantial similar e-mail communication stating or alluding that ag source from the three particular buyers are not certified under the USDA certified organic program or under American Humane. And so HVAC's arguments that they're prevented from speaking generally about Hansenbrook's ag certification process or speaking about their humane advocacy or political advocacy is simply not reflected in what the actual district court order reflects. One other point, Your Honor, is that HVAC alludes to the e-mail, the prohibitory – the corrective e-mail being a prior restriction and that's – Your Honor, we disagree that this e-mail is a prior restraint. In National Federation of the Blind VFTC 420F3331 at 350, this court noted the long-held distinction between prior restraints and then subsequent decisions to correct a wrong – a false statement. And the enjoining of – preventing of the sending of that e-mail only enjoins HVACs from disseminating the false and misleading statements determined therein, which is not protected speech. As Judge Duncan noted, that's what the Lanham Act is designed to do. And so, Your Honor, I have – unless the court has any further questions, I'll yield my time. Thank you, Mr. Carnick. Ms. Bonita, you have a few minutes. I'd like to clarify that the prior restraint issue is my client being restrained from discussing or disseminating the idea that their eggs may not be pasture raised. It really hasn't been established, quite frankly, that they are. Does the injunction prohibit you from disseminating the idea that – We understand – I mean – Let Judge Duncan ask her question. I'm trying to understand. You said disseminating the idea that – and I'm a little – that's a little fuzzy. Can you – In an abundance of caution, we read the district court's order to prohibit us from – and when I say us, I mean my client – from disseminating information within that e-mail. And so the suggestion by our client that Handsome Brooks eggs may not be – I want to say what they're cracked up to be, but – that they are not pasture raised, and this is the subject of a lawsuit in the District of Columbia right now against this farm. You know, that is something that is being restrained, we feel, by that order. And that – I want to clarify that that's the prior restraint we are talking about. It's not the – I'm sorry. Can you help me? I'm trying to find the language of the order quickly, and I'm not. I'm failing. Let me grab the order. No, that's okay. I mean, I'll read it. I don't want to take up your time. And again – and I'm paraphrasing, but we are prohibited from, obviously, further dissemination of that e-mail, and – the information within that e-mail includes the statement that none of those eggs were pasture raised, and so – Is the order the – which superseded the temporary restraining order, it was issued on June 15th. Okay. I think I may have the right – June 2nd, maybe? June 15th would be the final – yes. Okay. Is it that it is – defendant is temporarily enjoined from further dissemination of the May 2016 e-mail authorized by Adele Douglas entitled Unverified Pasture Raised Label Claims, or any substantially similar e-mail regarding the source or quality of eggs distributed by Hansen Brook that are packed by Phil's Fresh Eggs? Yes. So that's – we – that is – that second part is where we feel the prior restraint part comes in. But if I may, Your Honors, when we look at Bolger, in the Bolger case, we had a retail seller with an economic interest who referred to specific products in the flyer that was sent out, and who conceded that it was an advertisement. And the court found that – the Supreme Court found that all of those factors together constituted commercial speech. In Gordon and Breach, we had parties that were at the same level of a supply chain, and they were able to find that we were dealing with commercial speech. Here we have the parties that – Hansen Brook has said it's only this final sentence, right, this final sentence that kicks us over. It was 50-50, but that final sentence makes it commercial speech because it's a pitch for the services. The problem is that our client doesn't sell services to retail establishments. Our client is a nonprofit that inspects farms. Hansen Brook would be – That's a fair point, and we didn't get to that, although I don't think it's accurate to say that Hansen focuses on that final point. I think he – the one thing he was pretty adamant about was not backing away from his argument that it was the e-mail as a whole that was problematic, including the targeting. And I'm out of time. Well, my final point that I was making was that actually Hansen Brook would be a customer, if you would. Well, except that the Lexmark case makes it clear that you don't need a direct competitor relationship to sustain a claim under these circumstances. Well, you don't need a direct competitor relationship. However, if I may, Your Honor, may I respond on that, Your Honor? You don't need a direct competitor relationship, but again, that really was a standing issue. And there should be some level of – this is an unfair competition case, right? I mean, this is – the idea of the Lanham Act is to – That's why it's indirect here, allegedly, because – it's indirect because obviously if those grocers like to sell eggs that have been certified to be humanely raised chickens, and you're saying – and you're saying you certify that process, and you're saying, well, the people you use to do it, you know, you need to stop that relationship and consider me. That's what indirect competitor is, isn't it? They're not necessarily in competition. Hansen Brook could say, come out and look at our farm and certify us. That doesn't mean that they can't surmount your counter-advertisement. That doesn't mean it is not indirect competition. Certainly, they could come out and say, oh, what they say is absolutely untrue. That's obviously – but the point is you're in the vein of indirectly impacting – because, for example, if your message is successful, right, the triangulation is, then this grocer will say, you know, I got this e-mail, it's very convincing, and, you know, people were certifying our eggs, they're not doing well, then I need to go over to the people who wrote this e-mail. That's what indirect – in that – I mean, I'm not asking you to concede that you did that, but the question is, does not require to be direct. That's what it means. It can be indirect. Yours is quite clearly the next step to indirect, isn't it? I'm just asking – I would suggest, in response to that, I would say that I don't think that just because someone can affect your sales or affect your bottom line, that for the purposes of the Lanham Act, we should expand the Lanham Act to encompass all of those potential parties, especially when it's going to encroach on speech that might otherwise be protected by the First Amendment. Fair enough. I think that's understood. What you do is always going to impact, if it's successful, on someone's bottom line, because you're saying, I'm trying to protect these animals, and if you are selling a product that's seemingly telling the consumer that they are protected, then I'm telling you they're not. I think you're right that that's not the test, that it will affect your pocketbook, but here the question is, does it go too far in terms of advertising your services against – I mean, that's the question. I don't think it – May I respond? Please. I think that if our client had listed off a bunch of egg brands that were certified humane and said, buy these, instead of Hansenbrook, that might have been different, but they did not. Well, then why did you choose to identify – I mean, the problem that I think you run into here with – I thought about the direct – the markets. You ticked the market when you identified Hansen Farms in the e-mail. In the e-mail. So apparently that was your – you brought them into your market. Because that was – It doesn't matter why. You identified them as a problem for affecting – to affect their sales. Well – Change suppliers. Well, may I – Of course. Because that was the – that's who was identified as having the problem. No, that's part of what's false. Well, first of all, that hasn't actually been determined to be completely false, but at the audit site, and it's in the appendix, there are these pallet labels. First of all, these pallet labels – I don't think that – I think the question is just going to the market. I understand. And I think you're right, and I think Judge Gregory's question recognizes that there will be a line too far. And the only problem I'm having is that it seems, at least to me, that you drew the line here. Well, and I do want to point out just one thing, if I may, Your Honor. It is sort of – there were pallet labels associated with these source farms that happened to erroneously have our client's certification on them. So there was this triggering event during the audit where certified humane was on pallet tags of source farms of Hansenbrook. So, I mean, there was sort of this perfect storm of events that led to all of this. But unless the Court has any further questions, I don't have anything else. All right. Thank you so much.
judges: Roger L. Gregory, Allyson K. Duncan, Albert Diaz